UNITED STATES DISTRICT COURT
DISTRICT OF CONNECTICUT

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | : | |
| | : | |
| v. | : | CRIMINAL NO. 3:09CR117 (MRK) |
| | : | |
| DONALD PARKER. | : | |

## MEMORANDUM OF DECISION

On May 20, 2009, Defendant Donald Parker and thirty-two other defendants were indicted on various charges related to a drug distribution conspiracy. *See* Indictment [doc. # 1]. Mr. Parker is charged with one count of Conspiracy to Possess with the Intent to Distribute, and to Distribute, Cocaine and Cocaine Base (crack cocaine), in violation of 21 U.S.C. §§ 841(a)(1) & 846; and one count of Possession with Intent to Distribute Cocaine, in violation of 21 U.S.C. §§ 841(a)(1) & 841(b)(1)(C). *See id.*; Superseding Indictment [doc. # 586]. Mr. Parker now moves to suppress all physical evidence taken from his home in Hartford, Connecticut on March 3, 2009. Mr. Parker asserts that the evidence must be suppressed because it was seized in violation of his Fourth Amendment rights; specifically, Mr. Parker argues that law enforcement officers entered his home and seized the evidence in the absence of consent, exigent circumstances, or a valid search warrant. *See* Def.'s Mem. in Supp. of Mot to Suppress [doc. # 669] at 8-10.

On February 16, 2010 the Court held an evidentiary hearing on Mr. Parker's Motion to Suppress, during which it heard testimony from Manchester Police Officer John Rossetti, Hartford Police Officers Abhilash Pillai and Zachary Sherry, and New Britain Police Officer Frank Bellizzi. *See* Exhibit & Witness List [doc. # 726]. With the exception of Officer Sherry,

1

all of the officers were assigned to work on a drug task force with the federal Drug Enforcement Agency (DEA) for all times relevant to the Motion to Suppress. The Court also received into evidence the warrant for the search of Mr. Parker's home. *See id.* Following the hearing, the parties were permitted to file supplemental briefs. *See* Government's Supplemental Mem. in Opp'n to Mot. to Suppress [doc. # 728]; Def.'s Supplemental Mem. in Supp. of Mot. to Suppress [doc. # 743]; Government's Second Supplemental Mem. in Opp'n to Mot. to Suppress [doc. # 772]. Upon consideration of the parties' briefs and the evidence received at the evidentiary hearing, and for the reasons set forth below, the Court now DENIES Mr. Parker's Motion to Suppress [doc. # 669].

## I.

The facts relevant to the Motion to Suppress are largely uncontested. Mr. Parker's vehicle was stopped by Officer Sherry at approximately 3:49 p.m. on March 3, 2009 because of Mr. Parker's failure to come to a complete stop at a stop sign and his failure to use his turn signal. During the stop, Officer Sherry asked Mr. Parker to exit the vehicle to be frisked for weapons. As a result of the pat-down search, Officer Sherry discovered a white powdery substance, believed to be cocaine, and drug paraphernalia on Mr. Parker's person. Officer Sherry then placed Mr. Parker under arrest.

Mr. Parker originally sought to suppress the evidence seized and statements made during this traffic stop, which Officer Sherry's testimony addressed. However, following the hearing, the Government filed a supplemental brief, representing that it would not introduce any evidence or statements related to the traffic stop during its case-in-chief at trial. *See* Government's Supplemental Mem. in Opp'n to Mot. to Suppress [doc. # 728]. The parties agree that this makes Mr. Parker's motion to suppress the evidence obtained as part of the traffic stop moot. *See id.*;

Def.'s Supplemental Mem. in Supp. of Mot. to Suppress [doc. # 743] at 1. Accordingly, that portion of Mr. Parker's Motion to Suppress is denied as moot, and the Court expresses no opinion as to its merits. This opinion is therefore confined to the subsequent search of Mr. Parker's residence.

Officer Sherry's initial stop of Mr. Parker's vehicle was at the request of Officer Pillai, who, along with other officers working on the DEA task force, had been surveying Mr. Parker's residence for some time. Mr. Parker had come to the attention of the task force through wiretaps that had been placed on the cell phones of co-defendant Peter Maylor. Through the wiretaps and information provided by a cooperating witness, the surveillance team had determined that Mr. Parker regularly purchased significant quantities of cocaine from Mr. Maylor, which Mr. Parker then sold to third parties. On the day in question, the officers intercepted calls between Mr. Maylor and Mr. Parker suggesting that the former would be arriving at Mr. Parker's home to sell him a quantity of narcotics. Thereafter, several officers, including Officer Pillai, set up surveillance around Mr. Parker's apartment complex at 60 Van Block Avenue in Hartford.

At approximately 2:43 p.m., the surveillance team observed Mr. Maylor pull into the parking lot at Mr. Parker's residence. After Mr. Maylor called Mr. Parker to let him know that he had arrived, Mr. Parker emerged from the complex and entered Mr. Maylor's vehicle, where he stayed for approximately 10 minutes. Mr. Parker then went back into his apartment, but returned a few minutes later to Mr. Maylor's automobile. After another few minutes, Mr. Parker returned to his apartment and Mr. Maylor left. Approximately fifteen minutes later, Mr. Parker came out of his apartment, started his Chrysler 300, and left it running while he returned to his apartment. An unknown Hispanic male then appeared from somewhere near the complex and cleared the snow from Mr. Parker's vehicle. Several minutes later, Mr. Parker emerged once

more, got into his car and drove off; he was stopped a few blocks away by Officer Sherry, who subsequently arrested Mr. Parker and transported him to the Hartford police department for booking.

Following Mr. Parker's arrest, the task force officers decided to seek a warrant to search Mr. Parker's residence for evidence related to the drug conspiracy.[1]  While the officers began drafting the warrant application, a member of the DEA task force, Officer Boemmels of the Bristol Police Department, was stationed in a parking lot near Mr. Parker's apartment complex to keep watch over the apartment, primarily to ensure that no one who could destroy evidence entered it.  Officer Boemmels's task was complicated, however, by his position and the layout of the apartment complex, which apparently prevented him from getting a clear line of sight to what was believed to be the door to Mr. Parker's apartment.  After Officer Boemmels reported that he had observed several individuals coming and going from the general area of Mr. Parker's apartment, and in light of the fact that Mr. Parker's girlfriend was known to share the residence, the other task force officers decided to enter and secure Mr. Parker's apartment while waiting for the search warrant application to be completed and approved.

Therefore, sometime around 6:00 p.m., approximately eight officers, including Officers Rossetti, Pillai, and Bellizzi, used Mr. Parker's key – obtained from his earlier arrest by Officer Sherry – to enter his apartment.  The officers conducted a "sweep" of Mr. Parker's apartment to ensure that no one was in the residence; none were.  According to the officers who testified, the entire "sweep" of Mr. Parker's apartment took approximately 60 seconds.  After the apartment was secure, Officers Pillai and Laureano, who were drafting the warrant application, left to complete it.  The other officers, however, inexplicably decided to wait *inside the apartment* for

---

[1] The officers first sought Mr. Parker's consent to search his apartment, which he did not give.

the warrant application to be approved. At some point, Mr. Parker's girlfriend arrived at the apartment. She was subsequently searched by a female officer and asked to cooperate with the task force. She agreed and was taken to the Hartford police station for questioning. At approximately 8:00 p.m., after the warrant was approved by a state-court judge, a search of Mr. Parker's apartment was conducted. During the search, the officers seized a handgun secreted in the living room couch, approximately an ounce of cocaine, materials for cutting and packaging cocaine, and approximately $17,000 in cash. This is the evidence that Mr. Parker argues must be suppressed.

## II.

The law governing residential searches is relatively well settled. The Fourth Amendment protects "the right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures." U.S. Const. amend. IV. "It is a basic principle of Fourth Amendment law that searches and seizures inside a home without a warrant are presumptively unreasonable." *Brigham City, Utah v. Stuart*, 547 U.S. 398, 403 (2006) (quoting *Groh v. Ramirez*, 540 U.S. 551, 559 (2004)). However, "because the ultimate touchstone of the Fourth Amendment is 'reasonableness,' the warrant requirement is subject to certain exceptions." *Id.* One such exception that has long been recognized by the Supreme Court permits officers to act "to prevent the imminent destruction of evidence." *Id.* (citing *Ker v. California*, 374 U.S. 23, 40 (1963) (plurality)). To summarize the relevant jurisprudence, "[W]arrants are generally required to search a person's home or his person unless 'the exigencies of the situation' make the needs of law enforcement so compelling that the warrantless search is objectively reasonable under the Fourth Amendment." *Id.* (quoting *Mincey v. Arizona*, 437 U.S. 385, 393-394 (1978) (alterations in original)).

Importantly, however, even if an exception justifies a departure from the warrant requirement, the Fourth Amendment nonetheless still governs the *scope* of the warrantless intrusion.  Accordingly, officers may only take those actions that are reasonably related to their purpose in entering the dwelling in the first place.  *See Terry v. Ohio*, 392 U.S. 1, 25-26 (1968) ("[A warrantless search must] be strictly circumscribed by the exigencies which justify its initiation.").  In situations, such as this one, where officers are concerned about the imminent destruction of evidence, these exigent circumstances only justify "a very quick and limited pass through the premises to check for third persons who may destroy evidence or pose a threat to the officers."  *United States v. Agapito*, 620 F.2d 324, 335 (2d Cir. 1980).  The reasonableness of such a "security check" is "simple and straightforward."  *Id.* at 336.  "From the standpoint of the individual, the intrusion on his privacy is slight; the search is cursory in nature and is intended to uncover only 'persons, not things.'"  *Id.* (citation omitted).  But "[o]nce the security check has been completed and the premises secured, no further search – be it extended or limited – is permitted until a warrant is obtained."  *Id.*; *see also id.* ("[A] determination of whether third persons are on the premises requires neither a lengthy nor disruptive stay.").

Here, the Government argues that "exigent circumstances justified the warrantless entry into Parker's apartment to secure the premises from the removal or destruction of items of evidentiary value."  Government's Mem. in Opp'n to Mot. to Suppress [doc. # 718] at 14.  The Government asserts that the task force officers "believed from their investigation of Parker that he was a higher level drug trafficker," "that Parker's residence might contain a significant quantity of drugs," that Mr. Parker lived in "a hot spot for drug trafficking activity," "that persons had been seen coming and going from the area of Parker's residence," and that the encroaching darkness and the positioning of the surveying officers made their actions in entering the

6

apartment "solely to secure the premises" objectively reasonable. *See id.* at 14-15. The Government does not, however, attempt to explain or justify the officers' decision to remain *inside* the apartment once it had been secured, *see generally id.* at 13-17, arguing instead that the Court need not reach this issue because "the warrantless entry had no bearing upon the state search warrant that was issued and pursuant to which the search of Parker's residence occurred." *Id.* at 15; *see also* Government's Second Supplemental Mem. in Opp'n to Mot. to Suppress [doc. # 772].

The Second Circuit considered somewhat analogous facts in *Agapito*, 620 F.2d at 335-37. There, a defendant convicted of charges related to a narcotics conspiracy challenged the entry of his hotel room by DEA agents following his arrest in the lobby of the same hotel. *See id.* at 328. After the arrest, the agents entered the room with the assistance of hotel security personnel. Once inside the room, the agents seized a blue suitcase, but did not open it until they had secured a search warrant for the room the following day. *Id.* The suitcase contained approximately a kilogram of cocaine, which formed part of the basis of the defendant's subsequent conviction. *See id.*

The Second Circuit ultimately held that the warrantless entry of the hotel room violated the Fourth Amendment. Crucial to the Court's holding was that "[t]he agents had the room under constant surveillance for two days," and therefore "[a]ny belief by the agents that third persons were in the room would not have been reasonable." *Id.* at 336. The Court also found the "intrusiveness" of the agents' "security check" to be "far from minimal." *Id.* at 337. In addition to seizing the suitcase, the agents "intercepted phone calls [to the room] and arranged for the room to be used as overnight sleeping quarters for [another suspect]." *Id.* "In short," the *Agapito* Court summarized, the agents "moved in." *Id.* The Court concluded that

> Once it was determined that third persons were not present, the agents should have left the room. The public interest thereafter in securing the room, located on the seventeenth floor of a hotel, could have been served just as well by stationing a guard outside the door.

*Id.*[2]

Nonetheless, despite explicitly holding that the warrantless entry into the hotel room was illegal, *see id.* at 337, the Second Circuit affirmed the district court's denial of the defendant's motion to suppress and upheld the conviction. The Court explained that "Although the agents seized the suitcase in [the hotel room] which contained the cocaine, they did not open it until after the warrant had been obtained. The one kilogram of cocaine, therefore, was admissible *if the warrant was valid.*" *Id.* at 338 (emphasis added). After examining the admissible evidence supporting the warrant affidavit, the Court concluded that the warrant was valid, making the seized cocaine found in the suitcase admissible. *See id.*

The reasoning in *Agapito* was explicitly endorsed by the Supreme Court in *Segura v. United States*, 468 U.S. 796, 814 n.9 (1984). There, the Supreme Court held that that where a search warrant was supported by evidence obtained independent of an earlier warrantless "security sweep" that turned into an "occupation" of the premises, the search pursuant to the warrant is valid and any evidence obtained as a consequence is admissible. *See id.* at 814-15

---

[2] The Court in *Agapito* was careful to distinguish it from cases

> where third persons are discovered on the premises whom the agents do not have probable cause to arrest but who nevertheless might destroy evidence. Under these circumstances, arresting officers may have to remain on the premises following a security check[, as] there may be "no other practical means" of securing the premises until a warrant can be obtained.

*Id.* at n.19 (citations omitted); *see also United States v. Fortgang*, 77 Fed. Appx. 37, 38-39 (2d Cir. 2003) (summary order). This case is also distinguishable from *Agapito* in this respect, as no one was found in Mr. Parker's apartment when the agents entered. Only later did Mr. Parker's girlfriend arrive, but she could have been just as effectively intercepted by officers stationed on the outside of the apartment's two exits.

("Had police never entered the apartment, but instead conducted a perimeter stakeout to prevent anyone from entering the apartment and destroying evidence, the contraband now challenged would have been discovered and seized precisely as it was here. The legality of the initial entry is, thus, wholly irrelevant . . . .").

The relevant principle to be gleaned from *Agapito* and *Segura* is that even when a "security sweep" exceeds its constitutionally-permissible duration, and when (as here) officers remain in the apartment longer than necessary to conduct the sweep, suppression of evidence seized pursuant to a later search warrant is not justified so long as the warrant was secured on the basis of evidence obtained independent of the warrantless entry.

### III.

Applying the foregoing principles to the facts of this case, the Court concludes that suppression is not warranted. It is uncontested that the affidavit supporting the warrant application made no mention of the warrantless entry of Mr. Parker's home or anything the officers may have seen once inside. *See* Search Warrant, Ex. 501 [doc. # 726].[3] In fact, the officers' uncontradicted testimony was that they did not see or seize anything of evidentiary value until the warrant was approved.

It may be the case that the officers violated Mr. Parker's rights under the Fourth Amendment. To be clear, the Court does not condone the agents' behavior in prolonging their

---

[3] The warrant affidavit was inconsistent with the testimony in two minor respects, as pointed out by Defendant. *See* Def.'s Supplemental Mem. [doc. #743] at 5. However, under the Second Circuit's "corrected affidavit" doctrine, *see United States v. Martin*, 426 F.3d 68, 73-74 (2d Cir. 2005), whereby the Court "disregard[s] the allegedly false statements and determine[s] whether the remaining portions of the affidavit would support probable cause to issue the warrant." *United States v. Canfield*, 212 F.3d 713, 718 (2d Cir. 2000) (citation omitted), the Court finds that the "corrected" affidavit still would have established probable cause to search Mr. Parker's apartment. *See id.* In particular, the information gleaned from the wiretaps, the confidential witness, and the surveillance of Mr. Parker established probable cause to believe that he was involved in a large and wide-ranging drug distribution conspiracy.

warrantless stay in Mr. Parker's home beyond what was necessary to ensure that no one was in the residence. But where, as here, any Fourth Amendment violation is unconnected to the evidence seized, suppression is unwarranted. *See Segura*, 468 U.S. at 814; *see also Nix v. Williams*, 467 U.S. 431, 443 (1984) ("[T]he interest of society in deterring unlawful police conduct and the public interest in having juries receive all probative evidence of a crime are properly balanced by putting the police in the same, not a *worse*, position that they would have been in if no police error or misconduct had occurred.").

Accordingly, for the forgoing reasons, Mr. Parker's Motion to Suppress [doc. # 669] is DENIED.

                                                             IT IS SO ORDERED.


                                                             /s/  Mark R. Kravitz
                                                                   United States District Court

**Dated at New Haven, Connecticut on March 5, 2010**.